Good morning, Your Honors. My name is Peter Sessions. I represent the plaintiff and the appellant in this case, Kimberley D. I'd like to reserve two minutes for rebuttal, if I could. This case is about a woman who suffers from major depressive disorder, anxiety disorder, and an eating disorder. And as the district court aptly noted below, this is a sad case. The record shows that she has a history of childhood sexual abuse, suicidal depression, crippling anxiety, family conflict, including drug addiction in her home. So as a result, in 2012, this led her to seek intensive outpatient treatment, or IOP treatment, near her home in San Diego. Unfortunately, this treatment was unsuccessful. So in May of 2014, at the recommendation of her treatment providers in San Diego, she was admitted to the residential treatment program at Sierra Tucson, which is a facility in Arizona that specializes in the treatment of people with depression. When you say at the recommendation of her treatment provider, is this a recommendation from the facility in Arizona or from somebody else? In San Diego. In San Diego. So she goes to IOP treatment in San Diego, and then at the conclusion of that treatment, her therapist there recommended that she seek further residential treatment at Sierra Tucson. Now, did the therapist in San Diego specifically recommend the Tucson facility, or just you get some residential treatment? I would have to double-check the record. I believe she specifically recommended the facility, but I'm not certain of that. One of the arguments that the defendant is making is that there were residential treatments closer to San Diego than the Arizona, and I'm trying to figure out where the recommendation came or the choice came to go to Arizona. I believe that came from her therapist in San Diego, and I understand that that's a contention that's raised, but I don't think it's relevant in this case. Well, it might or might not be, depending on her motivation for going all the way to Arizona. It looks like a really nice place on the website. It looks like a nice place for a vacation. That's the argument. That's the between-the-lines argument from the other side. I understand, but I don't think that's persuasive because if someone is receiving residential treatment, then they have left their home. Obviously, it's residential treatment. They're residing somewhere else. So the fact that it's in Arizona as opposed to Oregon or California or anywhere is irrelevant. At that point, you're out of the bad situation that you're in. And it's her right under the benefit plan to go to whatever facility she wants as long as it's covered, and this one was. So Sierra-Tucson, she finally begins receiving this treatment that she needs, but unfortunately, despite her need for the treatment and the efficacy of the treatment, United refuses to pay benefits for any of the treatment. They don't pay for a single day of the treatment. So our contention, obviously, in this appeal is that this decision was incorrect and that the district court's decision upholding that was incorrect. How much money is at stake here? It's about $40,000, Your Honor. So it's not ongoing. She was discharged at some point. Why did her husband sign up after she's released saying he will be personally responsible for the bill? I don't know the answer to that question. There's some hint in the record that it's on advice of counsel. I mean, it totally puzzles me. I understand why somebody would say before the treatment is offered, yes, I'll do it, because they're desperate that the person comes in. She's been out of there for almost two months, at which point he signs and says I'll be personally responsible for it. I don't get it. Well, clearly the record shows that she and her husband have a tenuous relationship. The benefit plan comes from his employment. Maybe he feels some responsibility for it. I'm speculating. I don't know the answer to that. I don't want to intrude in any way on attorney-client relationship. But on advice of counsel, it sounds like it wasn't you. No, it wasn't me. I can say that with certainty, Your Honor. At any rate, what we have here is a case that revolves entirely around the issue of medical necessity. I think we all agree that, even United agrees, that Kimberly needed medical treatment. So the question is, what level of treatment did she need? And also, counsel, what is our review of that decision? Certainly, right. That's correct. So the question is, what's the right level? And I'll get to that standard review in a moment. And in order to understand what the right level was for Kimberly, we have to understand what these levels of treatment are. On one hand, we have residential treatment, which is what she was getting. And then we have intensive outpatient treatment, which is what she had been receiving and which is what United and the district court contended that she should have had this time around. And the difference is this. Residential treatment involves 24-hour living at a facility. You're under continual supervision. There's a physician presence there. There's nursing staff. All meals are supervised. So if you have an eating disorder, as she did, that can be supervised. And any needs you have can be met immediately. And then, on the other hand, you have IOP treatment. And this is a radical step down. In IOP treatment, you live at home, and there's no supervision, and you meet with your treatment providers for a few hours a day, a few days per week. You're on your own with regard to preparing your meals, which is obviously problematic for people with eating disorders. And you're relying primarily on your family for support. Is that right, correct, that one of the doctors for the company said it didn't provide enough and the other said it provided too much? Yes. That is one problem when you look at this record. At the end of the day, United's final denial said what the district court said, which was that you didn't need this high of a level of treatment. You could have gotten this lower level of treatment. But if you look at the record, United's decisions are, frankly, all over the place. At certain points they say you didn't need this high level of treatment, but at other points they say, oh, there's evidence that you were suicidal, so you should have gotten a higher level of treatment. And that's true. And what I stated from the other side, what they're saying is, listen, if she truly is suicidal, you better get her tested for that. And if that's true, then she needs a higher level of treatment. But she was never assessed for being suicidal, so that didn't happen. But they've got to be right that if she's truly suicidal, she shouldn't be in that residential facility. She should be somewhere else. That's correct. So the question is, was she truly suicidal while staying in the Arizona facility? And the Arizona facility never took steps, and she never took steps to get tested as to whether she truly was suicidal. Well, I would disagree with that. Okay, good. As with all things with mental illness, there are gradations of suicidality. Sure, and it's ambiguous and difficult to predict. Sure. And the record shows in this case what she said, what she told Sierra Tucson was, if I am discharged, this happens when she learns that the insurance company might deny her claim. She becomes upset and says, if I'm discharged, I will go home and kill myself. Right. I think she said I'll check into a hotel. Right. She has an active plan. She explains to Sierra Tucson how she'll do it. And then when she's pressed, when they investigate and they ask her further and they consult with her, she admits, well, that's what I'll do if I get discharged. But I won't do it while I'm here because I wouldn't do that to the staff. And they made her sign a contract for safety. So she agreed that she would not hurt herself while she's in the facility. She agreed not to kill herself in the facility. Right. She signed what's called a contract for safety. That's what the facility was concerned about. Right. So what we have here is a situation where residential was the appropriate level of treatment for her because if she was discharged, she was clearly a threat because she had told people, Sierra Tucson, that she was going to kill herself. Now, when she was discharged, did the facility give a rating as to whether she was suicidal? At the time she was discharged, she was no longer suicidal. She just said before that she told them if she was discharged, she was going to go to a hotel and kill herself. At the time, because this was right at the beginning of her treatment. She's there at the facility for another month and a half. After the treatment, she wasn't suicidal anymore? Right. At the time, when she was discharged a month and a half later, she was no longer suffering from that same extreme situation. But she went to this facility at the recommendation of a psychiatrist or whatever, wherever she was, it was a medical recommendation, and that's what she followed. If she should have been at a higher level, it hardly would seem to be her fault that she followed medical advice. Well, that's our argument is that she was not only was residential level the appropriate level of care for her, but it was also the recommended level of care. And this goes to the district courts and United's contention that her prior treatment at San Diego had been, quote, effective. This was really the linchpin of the district court's argument was, you don't need this residential treatment because you have had IOP treatment before and that worked. But this finding was, and this goes to Judge Owen's question, it was clearly erroneous. It's not supported by the record. The record shows that while she was in IOP treatment in San Diego that she continued to restrict and binge. She had multiple safety assessments and welfare checks because of her suicidality. She couldn't follow her meal plan or implement coping strategies for eating appropriately. Kimberly herself said that she didn't feel like she had made any therapeutic progress while she was in IOP. So in other words, the IOP program had been effective to the extent that her symptoms, her outward expression had decreased, but her underlying problems were still the same. They never went away. The IOP treatment never treated that effectively. Can you point me to where, this is not challenging you, I just want you to point me to where in the district court's opinion the district court concludes that her IOP treatment was effective? Sure. The district court does it, I believe, in two places. Okay. Excerpts of record at 13. ER 13. Okay, hang on. Let me find it. Hold on. It's certainly on 14. Sorry. Okay. I'll go to 14. 14 on line, starting on line 2, the district court says, the record shows that Plaintiff received effective treatments for her eating and related disorders from EDCSD for the April through August 2013 time frame. Got it. Okay. So, unfortunately, the district court doesn't cite to any citations in the record. Well, there may be a reason for that. So it's frustrating to understand why the district court came to that conclusion when her therapist at San Diego said that it hadn't worked, and she herself felt that that hadn't worked. So that's, and that gets to the standard review issue. That's one of the clearly erroneous findings, and I think that's the primary clearly erroneous finding was that her treatment had been effective there when the record, I think, very clearly shows that it was not. The second thing I'd point out is that the district court heavily relied on Kimberly's, quote, medical stability supporting United's denial decision, and that's in the excerpts of the record at 13. The district court found that the record shows that Plaintiff was medically stable throughout the relevant time frame. However, medical stability is not a disqualifier for residential treatment. On the contrary, both the UBH guidelines, which are United's internal guidelines that they use, and the American Psychiatric Association guidelines, they both require medical stability in order to receive residential. Let me ask you the question in this way. She's being treated as an outpatient with this so-called IOP, and as I read the record, it's not doing very, it's not very effective, but that's what she's doing. The home situation deteriorates. She's got a son and the son's girlfriend who are heroin addicts living at home. The girlfriend starts accusing the son of misbehavior. The father, her husband, moves out ostensibly because he doesn't want to get caught up in the histrionics with respect to the girlfriend and get accused. So life goes to hell at home. That's right. And that contributes to the fact that the outpatient situation isn't working very well, because if you're going to be an outpatient and you're living at home and the home situation severely deteriorates, as it does, if that's the narrative and if that's the, quote, why now, because she's willing to kind of bump along with the IOP treatment that's not working out very well until the home situation deteriorates, and so now she wants residential treatment because the home situation and the IOP treatment is getting even less effective. Is that a sufficient reason for why now and why then the residential treatment is appropriate under the policy? Yes. The answer is yes. Though it's not really a medically, it's not a medical change. It's a home situation change. Sure. Let me explain why. United and the district court seem to insinuate, without explicitly saying so, that the reason that she went to residential treatment was just so that she could get out of her house. And that's clearly not the case, because she clearly has a long history of mental illness. And what happened here exacerbated that. And if you look in UBH's own guidelines or if you look in the APA guidelines, they both say that poor support at home can be a qualifying factor for bumping up to residential treatment. In fact, UBH's guidelines say, and this is in the excerpts at 665, this is an element that supports residential treatment, psychosocial and environmental problems that are likely to threaten the member's safety or undermine engagement in a less intensive level of care. That's exactly what happened here. She was receiving outpatient treatment, and then her home life deteriorated, and that undermined her engagement and made her worse. So this is absolutely a precipitating event. So it can't be the only reason I want to get out of the house, but if it's a contributing reason on top of the otherwise existing medical condition, that, in your view, is permissible under the policy? Right. Not only in my view, but under the guidelines as well. Got it. Okay. Thank you. Good morning. Raul Martinez for UnitedHealthcare. Let me first address the question of the effectiveness of the outpatient treatment in San Diego because the record does indicate that it was effective, and the district court made a specific finding, perhaps not citing to the record, but I can cite you to the passages in the record that I think indicate it was effective, and it's in ER 1543. ER, let me write this down, 1543? 1543. And this is from the Eating Disorder Center of San Diego, and it's dated July 17, 2013. And I'll say something about the record. which is a reason why the standard of review in this case has to be for clear error. The district judge went through this record very thoroughly, issued a 15-page, very detailed opinion, made factual findings, and I think the fundamental question that this court has to reach is the standard of review has to be clear error. On this point of the effectiveness, I'll quote what I'm referring to under 1543. Yeah, that would be useful because I've got a lot of stuff here, but I don't have that. It's a very difficult record to go through. It's like seven volumes, so you've got to use a magnifying glass to get through it. But this is what I'm quoting. It indicated that her binging has decreased and she is not overeating. She is making better food choices. She is less sedentary and walking two to three times per week. She was occasionally restricting during the day and binging at night, but she is no longer engaging in those behaviors. She is no longer actively engaging in compensatory eating behavior such as purging or using laxatives or diuretics. No acute medical instability was described. The patient is not suicidal, self-injurious, homicidal, aggressive, or psychotic. And what date was that? That is July 17, 2013. July, say again? July 17, 2013. 2013. And at what point does she go to Tucson? That was the following year in 2014, so it was much longer. And do we have other reports from the IOP? This is, I think, what's in the record. That's all we have. I'm not aware of anything more closer to the events of Sierra Tucson. It was a year between her treatment at the IOP and the time she went on to the next facility. Yeah, it was almost a year, I believe, when she went to the Sierra Tucson facility. And we have no other reports as to how the IOP is working after July 17, 2013? I don't think she was discharged from the IOP. She had gone through, I think, a total of 60-some sessions where she was seen intensively for two hours a day. And so she was making progress. So I think the question in the district court's mind was, why didn't she go back to that treatment approach, the outpatient treatment, and all of a sudden she wants to appear and be admitted at a residential facility? I think you answered my question, but I want to make sure. Are there no further reports as to how she's doing in IOP after July 17? I think that's all that I've seen. Again, the record is very dense. I don't recall anything more recent. So your answer is you don't recall. I don't recall. I think this is what the statement was when she was discharged, when she was released after those 60 days of treatment. Okay, thank you. So that, I think, hopefully answers the question. Going back to the clear error issue, the district court reviewed the reports of six board-certified psychiatrists who said that the appropriate level of treatment was not residential. That's a factual finding that this court has to defer to. In terms of her suicidal tendencies while she was at the Sierra Tucson facility, the only time that she expressed any thoughts of suicide was when the claim was denied, when she was told that she was not going to get UnitedHealthcare to pay for those benefits. But if you look at the rest of her stay at Sierra Tucson, she's stable in the sense that she's not reporting any suicidal threats. And we cite in our appellee's brief the various portions of the record where the nurse's notes indicate she's not suicidal, where the patient's own sheets, the patient is interviewed every day and has to describe her symptoms, the patient doesn't state that she's suicidal. And if she had been suicidal, I'm quite sympathetic to your client, if she had been suicidal, she shouldn't have been there. She should have been somewhere else. But the fact that she's not suicidal doesn't say that the residential treatment is inappropriate. Indeed, it suggests that it is appropriate. The problem, I think, is that this case was tried, and if you look at the opening brief, the only issue on appeal that they raise, and I think they were stopped to claim otherwise, is that the reason for the treatment at the residential facility is because she was suicidal. The argument was not that she had an eating disorder or that she was depressed or et cetera. It was all focused on the suicidality. That's how the case was tried. All right. Well, I'm reading the statement of issue in the blue brief. Did the district court earn finding that a mental health patient did not need residential treatment when the record demonstrated that she would commit suicide if she were released, not if she were suicidal in the residential facility? Right, right. I think it's semantical. No, no, that's a very important difference. If she's suicidal while there, your client's clearly right that she shouldn't be there. She should be at a higher level of treatment. If she's suicidal only if she's released, that is not inconsistent with her being there appropriately. Right, right. And my response to that is that only time that she said she felt suicidal tendencies was after the claim was denied. During the rest of her stay there, she was not suicidal. The physician who interviewed her when she first went to Sierra Tucson, Dr. Sip, her evaluation is very clear that there's no suicide ideality, and Dr. Sip states that Kimberly's thought content is devoid of suicide ideation or homicidal ideation. She denies current intent or plan to commit suicidal harm to herself. So the overall record does not support, there's no clear error here in Judge Miller's findings. Judge Miller did his homework on this case. It's a very extensive record, and he wrote a very detailed statement of decision, and so we would urge the Court to affirm. Do you have any insight as to why the husband who's willing to sign almost two months after she's discharged a piece of paper that obliges him personally to pay? I don't have any insight. If it's on the recommendation of attorneys, perhaps they were trying to seek a recovery and use that as a vehicle. I think it's your brief that says apparently on advice of counsel. Now, what do you know that I don't know? I don't know anything more than what's in the record. I don't know which counsel advised her to pay it. It happened two months later. I am not certain. I'm not privy to her discussions with counsel or exactly where that, frankly, comes out in the record. To me, I think that's irrelevant. I mean, I agree with Mr. Sessions. Well, it's irrelevant, but puzzling, and I'm trying to figure out, I mean, what's going on, and I guess I can't. Yeah, sometimes you can't, and I'm not in their camp, so I don't know. It is a $40,000 case. It's an ERISA case. Attorneys' fees drive these cases. We all know that. So if they recover, they get attorneys' fees? That's part of the deal? That is my speculation. No, I'm just asking the law. If they recover, they get attorneys' fees? They would get attorneys' fees subject to whatever conditions ERISA provides, but that is the general rule. Thank you. Very briefly, Your Honor, I'll just address two quick points. Two minutes. One has to do with the effectiveness. Counsel cited to a page in the record, and I want to clarify that the page that is cited is not medical records from the IOP facility. It's to United's internal claim notes. So this is not, unfortunately, straight from the horse's mouth. Now, you said that fairly quickly. Don't feel under time pressure. I didn't quite understand how you're describing this document. This is apparently the document that's ER 1543? Yes. So what is the document? The document is from United's internal claim notes about the process of the claim. So I'm not saying that it's inaccurate, but at the same time, it's filtered. But it's not a doctor's note? No, it's notes from the claim adjuster, which I assume is taken from a conversation with the IOP facility. Okay, I got it. Okay. But at the end of the day, is there anything? I'll ask you the same question. I got, I'm sure, a straightforward and honest answer that your opposing counsel didn't recall. Are there any later evaluations with respect to her IOP? When you say later, in which time period are you referring to? Well, the evaluation that was read to us was July 17, 2013. And she doesn't go off to Arizona for another year. Are there any evaluations of IOP after July 17, 2013 in the record? I don't believe there is, Your Honor. Okay, so the same answer. Okay. And as far as suicidality goes, I would be the first to admit that there are inconsistent reports in the record regarding suicidality at the time she's admitted. I think that's frankly unsurprising, given mental health patients often give inconsistent reports of their mental status. It's entirely conceivable that she would tell her doctor one thing and medical staff something else, which would lead to inconsistent reports. But at the end of the day, I don't think it matters because it's undisputed that she made this threat. I don't think counsel disputes that she made this threat, that she would go home and kill herself if she were discharged. So that's not disputed. And second of all, suicidality is not a litmus test for residential treatment, which is something I've already addressed. We're, our contention is not that, in this case, it's not that she was suicidal, but that she qualified for residential treatment. So even if counsel is correct and she was not suicidal. So why did you write your statement of issues the way you did? The suicidality is the best evidence that shows that she was entitled to residential treatment. That's why we highlighted it in the statement of issues. So, but there's certainly plenty of other evidence in the record that we've cited too, which even if the suicidality is ignored, shows that residential treatment was the appropriate level for her. Thank you, Your Honor. Okay. The case is targeted and submitted. The court will stand in recess today. All rise.
judges: Reinhardt, W. Fletcher, Owens